IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Transition Healthcare Associates, Inc.          Case No. 3:06-CV-2859

       Plaintiff,

  v.                                                ORDER

Tri-State Health Investors, LLC,

       Defendant.

This is a suit by a provider of rehabilitative services to three nursing homes, Elm Creek Nursing Center [Elm Creek], New London Health Care [New London], and Spring Creek Nursing and Rehabilitation Center [Spring Creek]. The plaintiff, Transition Healthcare Associates, Inc. [Transition] seeks recovery from defendant Tri-State Health Investors, LLC [Tri-State], a Florida company providing administrative services to nursing facilities. Transition claims that Tri-State is liable for unpaid bills owed by the three nursing facilities. Transition alleges claims for breach of contract and unjust enrichment. Jurisdiction arises under 28 U.S.C. § 1332.

Pending is Tri-State's motion for summary judgment. [Doc. 15]. For the following reasons, the motion shall be granted.

**Background**

In September, 2003, Tri-State formed three Ohio-based corporations for the purpose of taking over Elm Creek, New London, and Spring Creek. Two entities listed Tri-State's address as their statutory agent's address; one entity listed Avi Klein, Tri-State's sole owner, as its statutory agent. Shortly after forming the corporations, Tri-State took over the three nursing facilities' operations.

While Tri-State expected to purchase the facilities, Health Bridge Management [Health Bridge], the facilities' owner, never formally transferred ownership to Tri-State. According to Transition, between September, 2003 and 2006, the facilities were in a period of legal limbo during which Tri-State expected Health Bridge to transfer ownership of the facilities. Tri-State never obtained ownership, but continued to provide back-office services while waiting for approval from the owner for the transfer of ownership.

Tri-State's primary responsibility was payment of the facilities' bills. Service providers would send invoices to Tri-State's office in Florida, from where Tri-State would issue payment. Tri-State opened checking accounts to pay the facilities' bills and received all statements associated with the accounts. The individual facilities then deposited funds sufficient to pay their individual bills. While Tri-State on occasion withdrew funds from the account, the individual facilities did not. When funds were scarce, Charley Menton, a Tri-State employee, would determine which invoices to pay.

Tri-State also took other actions indicative of ownership. On one occasion, Avi Klein signed as "Owner" a Pharmacy Services Agreement directed to Tri-State of West Carrollton d/b/a Elm Creek Nursing Center. Klein also signed similar agreements on New London's and Spring Creek's behalf. Likewise, New London's administrator established a Tri-State email address.

Taking note of these changes, Dun and Bradstreet, an international provider of credit information, listed Tri-State as the "owner/operator of Elm Creek." [Doc. 20].

Between March and April, 2004, Transition signed identical provider contracts with Elm Creek, New London and Spring Creek, individually agreeing that it would provide therapeutic services to those facilities. Though Tri-State was then managing the facilities, it did not sign those contracts.

While Tri-State initially paid Transition for the Transition's services to the nursing homes, eventually it stopped making those payments. Transition provided services through November 17, 2006.

Tri-State stopped managing the facilities on September 30, 2006.

Transition subsequently filed this suit, seeking recovery from Tri-State of $334,807.42 for services provided to the nursing facilities.

## Summary Judgment Standard

A court must grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For there to be a genuine dispute of material fact, the evidence must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant must show the absence of a genuine issue of material fact as to at least one essential element of the non-movant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In considering the movant's motion for summary judgment, the court must accept the non-movant's evidence as true and draw all reasonable inferences in that party's favor. *Eastman Kodak Co. v.*

*Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). The court will also grant summary judgment if the non-movant fails to make a "showing sufficient to establish the existence of an element essential to that party's case" for which the party bears the burden of proof. *Celotex, supra*, 477 U.S. at 322-23.

**Discussion**

The sole issue is whether Transition can hold Tri-State liable for the nursing facilities' non-payment. Generally, there is limited liability for shareholders and officers of a corporation. *Anderson v. Abbott*, 321 U.S. 349, 362 (1944) ("Limited liability is the rule, not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted."). A court may pierce the veil separating corporations and their shareholders, but will do so only rarely on a case-by-case basis. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003).

Under Ohio law, the plaintiff may pierce the corporate veil if:

> 1) the parent's control over the subsidiary was so complete that the subsidiary had no separate mind, will, or existence of its own; 2) the parent's exercise of control over the subsidiary amounted to fraud or an illegal act against the plaintiff; and 3) injury or unjust loss resulted to the plaintiff from such control and wrong.[1]

*Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007) (quoting *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Cos.*, 67 Ohio St. 3d 274 (1993)) (internal quotations omitted).

The *Belvedere* test applies whether the plaintiff is attempting to penetrate the veil to gain access to an individual or another company. *Minno v. Pro-Fab*, 2007 WL 4292625, *7 (Ohio App.).

---

[1] A party seeking to pierce the corporate veil need not "relate the specific intention in the complaint in order to proceed under the doctrine of piercing the corporate veil," but the plaintiff must include "sufficient information to show the desire to proceed under the theory." *Dombroski v. Wellpoint, Inc.*, 173 Ohio App. 3d 508, 515-16 (2007).

The party seeking to pierce the veil must "demonstrate that the grounds for piercing the corporate veil exist." *Nursing Home Group Rehab. Servs., LLC v. Suncrest Health Care, Inc.*, 162 Ohio App. 3d 577, 581 (2005). The trier of fact primarily determines whether the plaintiff satisfies the test. *Siva v. 1138 LLC*, 2007 WL 2634007, *2 (Ohio App.) (internal quotations omitted).

### 1. Alter Ego

Sharing of management and other personnel will not satisfy the *Belvedere* test's first prong.[2] The plaintiff must show that the "two entities are not separate[,] but share unity of interest and ownership." *Minno, supra*, 2007 WL 4292625, *5 (internal quotations omitted). "Mere control over a corporation is not in itself a sufficient basis" to pierce the corporate veil. *Belvedere, supra*, 67 Ohio St. 3d at 289. The plaintiff must demonstrate "extraordinary circumstances to justify holding [a shareholder] personally liable." *Siva v. 1138 LLC*, 2007 WL 2634007, *5 (Ohio App.). In deciding whether the plaintiff has demonstrated sufficient unity, the court will look for:

> 1) grossly inadequate capitalization; 2) failure to observe corporate formalities; 3) insolvency of the debtor corporation at the time the debt was incurred; 4) the parent holding itself out as personally liable for certain subsidiary obligations; 5) diversion of funds or other property of the subsidiary for the parent's use; 6) the absence of corporate records; and 7) the fact that the subsidiary was a mere facade for the operations of the parent.

*Corrigan*, *supra,* 478 F.3d at 724 (citing *LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App. 3d 417 (1991)).

The key question is whether the relationship is such that not imposing liability would be unjust. *Id*. Ultimately, the party seeking to pierce "must show that the two corporations are

---

[2] Ohio law allows one corporation to wholly own another's stock and employ common officers, directors, and other employees. *Minno*, *supra,* 2007 WL 4292625, *5.

5

fundamentally indistinguishable." *Minno*, *supra,* 2007 WL 4292625, *5 (internal quotations omitted).

Here, Tri-State never formally owned the facilities. Transition at most proves that the facilities were in limbo for a period during which it was not clear whether the previous owner had transferred the facilities to Tri-State – a transaction which never occurred.

Were I to assume that the other facts alleged together are sufficient to support a finding of ownership, Transition cannot prove unity between the organizations. Only one of the facts Transition alleges is relevant to the factors Ohio courts consider under the first prong. Tri-State allegedly paid itself out of the bank accounts it created to pay the facilities' bills. This could apply to factor five: "diversion of funds or other property of the subsidiary for the parent's use." *Corrigan*, *supra,* 478 F.3d at 724. Tri-State, however, could have kept these funds as payment for the services it rendered to the facilities. Regardless, satisfying one factor does not establish that the entities were fundamentally indistinguishable.

Accordingly, Transition has not presented enough evidence for a reasonable jury to conclude that Tri-State was the nursing facilities' alter-ego.[3]

### 2. Control Amounting to Fraud

Were Transition to satisfy the first prong, it cannot prove that Tri-State's control over the facilities "amounted to fraud or an illegal act against the plaintiff." *Corrigan*, *supra,* 478 F.3d at 724.

---

[3] In contrast, in *Pritchett, Dlusky & Saxe v. Pingue*, 1997 WL 578952 (Ohio App. 1997), where the court found that the plaintiff satisfied the first prong, substantial evidence supported its conclusion. Pingue lived rent-free in a house his company owned and received all proceeds from the home's sale. *Id.* at *13. Likewise, he regularly used his company to "pay his personal debts and expenses." *Id.* at *12. Pingue also charged the company substantial accounting fees resulting from his divorce. *Id.* at *2.

Absent "some corporate malfeasance," an allegation that the defendant breached a contract is not enough to satisfy the second *Belvedere* prong. *E.g., Nursing Home Group*, *supra,* 162 Ohio App. 3d at 582; *see Connolly v. Malkamaki*, 2002 WL 31813040, *6 (Ohio App.) (treating plaintiff's claim for unjust enrichment as a breach of contract claim and, thus, concluding that it does not satisfy the second prong).

In this case, Transition only alleges claims for breach of contract and unjust enrichment. It presents no additional evidence Tri-State engaged in corporate malfeasance or fraud. Accordingly, Transition has not satisfied *Belvedere*'s second prong.

## Conclusion

Because Transition has not met either *Belvedere*'s first or second prongs, I cannot hold Tri-State liable for the services Transition provided Elm Creek, New London, and Spring Creek. For the foregoing reasons, it is hereby

ORDERED THAT Tri-State Health Investors, LLC's motion for summary judgment be, and the same hereby is granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge